Jeffrey M. Wiltse
Las Vegas, Nevada

Telephone: (805) 570-9460
Email: TheChosenMortal@ProtonMail.com
Plaintiff, Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| JEFFREY M. WILTSE,<br><br>Plaintiff,<br><br>v.<br><br>UHS OF SPRING MOUNTAIN, INC., doing business as SPRING MOUNTAIN TREATMENT CENTER; LINDY LAY, D.O.; and DOES 1 through 3, inclusive,<br><br>Defendants. | Case No.: ___________________<br><br>COMPLAINT FOR DAMAGES<br><br>42 U.S.C. § 1983 AND NEVADA LAW<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. This action concerns deliberate and retaliatory factual falsification and denial of meaningful process while Plaintiff Jeffrey M. Wiltse was involuntarily confined at Spring Mountain Treatment Center from July 30 through August 7, 2024.

2. Plaintiff does not assert professional negligence, challenge a diagnosis merely because he disagrees with it, or ask the Court to decide whether medication or treatment met a medical standard of care. The challenged statements concern objectively verifiable facts about what Plaintiff wrote, said, knew, and did.

3. In an August 2, 2024 Physician Daily Progress Note, Defendant Lindy Lay, D.O., wrote that Plaintiff requested a change in doctor but wrote “no blacks” on a change-request form while “knowing fully well” that the other doctors were all of African descent.

4. Plaintiff did not write those words on a change-request form, did not authorize anyone to write them for him, did not ask to exclude Black physicians, and did not know the identities and races or ethnicities of all other available physicians.

5. Lay placed that attribution in the current-clinical-presentation portion of a two-page note. The next printed heading identified the mental-status examination as “justification for level of care.” On page two, Lay wrote “psychosis, hostile” as a barrier to discharge and “hostile, volatile” as the rationale for continued stay.

6. In a separate August 6, 2024 note, Lay wrote that Plaintiff reported he did not go to court because he wanted to plead the Fifth “because he admits he did commit a crime.” Plaintiff did not choose to miss or waive the hearing, did not admit a crime, and did not identify any crime. Any statement that he wished to invoke the Fifth Amendment was not an admission of guilt.

7. The chart also incorporated Plaintiff's reports about litigation, court communications, and government contacts into its description of his clinical presentation. Limited documented background concerning those real matters is pleaded only to establish external referents for the subjects being discussed, not to relitigate those disputes or challenge a medical diagnosis.

8. Plaintiff seeks relief for intentional creation or knowing use of false historical facts in retaliation for protected criticism and in the involuntary-custody process, and for facility personnel's deliberate interference with practical access to the proceedings. Negligence alone is not enough for the federal claims pleaded here.

## JURISDICTION AND VENUE

9. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Nevada claims because they arise from the same events.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because the challenged events occurred in Clark County, Nevada, and the institutional Defendant operates in this District.

## PARTIES

12. Plaintiff Jeffrey M. Wiltse is an adult Nevada resident. He sues in his individual capacity.

13. Defendant UHS of Spring Mountain, Inc. is, on information and belief, a Delaware corporation doing business as Spring Mountain Treatment Center at 7000 West Spring Mountain Road, Las Vegas, Nevada 89117. It is referred to as “Spring Mountain.”

14. Defendant Lindy Lay, D.O., is identified in Plaintiff's records as the attending physician. Plaintiff sues Lay in her individual capacity.

15. On information and belief, Lay acted as Spring Mountain's employee or agent when she created, signed, and circulated the challenged facility records.

16. Doe 1 is the presently unidentified Spring Mountain employee, agent, contractor, or other person acting with facility personnel who knowingly invented or knowingly supplied the supposed change-request form or the racial attribution, if that person was someone other than Lay.

17. Doe 2 is the presently unidentified Spring Mountain employee who received or knew of the first remote commitment proceeding and controlled one or more facility functions needed for Plaintiff's participation, including delivery of available papers, confidential access to counsel, physical movement, or the video connection.

18. Doe 3 is the presently unidentified Spring Mountain employee who received or knew of the follow-up proceeding scheduled for August 6, 2024 and controlled Plaintiff's transport or video connection. Plaintiff cannot identify Does 2 and 3 without staff assignments, access logs, video records, communications, and the commitment file.

**STATE ACTION**

19. Plaintiff was not a voluntary patient. Spring Mountain accepted and maintained physical custody of him under Nevada's statutory involuntary-admission process, and Plaintiff was not free to leave.

20. The confinement involved court proceedings conducted while Plaintiff remained in Spring Mountain's custody. Facility personnel controlled Plaintiff's physical and

technological access to those proceedings, and Lay's August 7 discharge note states that Plaintiff was “released by court.”

21. Lay participated in that custody process by completing and signing a July 31 psychiatric evaluation and medical-necessity certification and by completing daily notes whose form expressly treated the mental-status examination as justification for level of care and requested a rationale for continued stay.

22. For the detention-related conduct challenged here, Defendants participated in a joint, state-authorized commitment process rather than ordinary voluntary medical care.

23. Private mental-health providers may act under color of state law when they jointly participate in obtaining or maintaining involuntary commitment. Rawson v. Recovery Innovations, Inc., 975 F.3d 742, 751-56 (9th Cir. 2020); Cummings v. Charter Hospital of Las Vegas, Inc., 111 Nev. 639, 896 P.2d 1137 (1995).

24. Estate of Esche v. Bunuel-Jordana, 152 F.4th 1185, 1193 (9th Cir. 2025), noted that private Nevada hospital defendants did not contest state-actor status and cited Cummings, Jensen, and Rawson. Esche resolved only appellate jurisdiction and did not decide the constitutional merits.

25. Each individual Defendant acted under color of Nevada law only to the extent that person created, used, or supplied information for the involuntary-custody process or controlled Plaintiff's access to the proceeding by which that custody was reviewed.

## FACTUAL ALLEGATIONS

### A. Documented External Context

26. Before his confinement, Plaintiff was involved in a real mortgage-servicing action, Wiltse v. LoanCare, LLC, Eighth Judicial District Court Case No. A-20-809592-C. By

July 2024, Nevada appellate case No. 88420 arising from that action was pending. Those public proceedings existed regardless of the ultimate merits of Plaintiff's claims.

27. Plaintiff also had a documented dispute concerning Nevada Hardest Hit Fund mortgage assistance administered by the Nevada Affordable Housing Assistance Corporation ("NAHAC"). The record includes NAHAC decisions dated September 29 and December 1, 2017, and March 6 and June 12, 2018; a written appeal acknowledged in January 2018; and dated correspondence with NAHAC, its counsel, and public offices. Plaintiff does not ask this Court to decide the merits of that dispute.

28. Spring Mountain's discharge summary itself recorded Plaintiff's reports of a long-running "supreme court case" and emails to court officials. Lay's August 1 note recorded reports about being targeted and about Trump and Biden, checked paranoid, persecutory, and grandiose delusions, and identified "delusional, paranoid, psychotic" as the rationale for continued stay while continuing the Legal 2000 status.

29. The chart does not identify NAHAC, LoanCare, the underlying case number, or the appellate case number, and Plaintiff does not allege that Lay reviewed the underlying documents. These allegations establish only that some legal and government-related subjects had objective external referents. They do not allege that every interpretation Plaintiff expressed was accurate or that the documented disputes compelled his release. No claim against NAHAC, LoanCare, Avalon Legal Group, or LVMPD is asserted here.

**B. Confinement and First Proceeding**

30. Spring Mountain's records identify July 30, 2024 as Plaintiff's admission date, an involuntary legal status, and August 7, 2024 as his discharge date.

31. Lay signed a psychiatric evaluation and medical-necessity certification on July 31, 2024 at approximately 11:00 a.m. The evaluation's mental-status examination marked homicidal thought as “None.”

32. In the July 31 certification, Lay represented that inpatient admission was medically necessary and that medically necessary inpatient care was expected to exceed two midnights. The certification was not itself a court order.

33. The first remote commitment proceeding occurred on or about July 31 or August 1, 2024. Lay's August 1 note appears to state that a probate proceeding had occurred the preceding day.

34. Lay's August 1 note again marked homicidal thought as “None,” identified “delusional, paranoid, psychotic” as the rationale for continued stay, and included a plan to continue the Legal 2000 custody status.

35. On the paired page, Lay's handwriting appears to state, “Had probate yesterday and not criteria per court doctor, yet criteria.” Plaintiff does not yet have the hearing record and does not allege what finding or order the phrase was intended to describe.

36. Before the first proceeding, Plaintiff received no meaningful advance warning that the proceeding would occur. A Spring Mountain employee brought or wheeled a video screen into the room, and Plaintiff suddenly found himself appearing remotely.

37. Before that appearance, Plaintiff was not given the operative petition, supporting certificates, examiner materials, or other papers being used to seek or review continued custody.

38. Plaintiff had never met the attorney who appeared or was assigned to represent him, did not know the attorney's identity before the proceeding, and had no private consultation, meaningful preparation, or explanation before appearing.

39. Because Plaintiff was locked inside Spring Mountain, facility personnel controlled his physical location, delivery of papers, telephone access, privacy, and connection to the remote proceeding.

40. After the proceeding and before Lay's August 2 note, Plaintiff spoke directly with Lay. He told her, in substance, that the lack of warning and preparation was unacceptable, the proceeding had been so brief that he did not understand what had happened, and he wanted to know why he had not met with his attorney beforehand. When Plaintiff discussed trying to start a cryptocurrency business, Lay told him, in substance, to make sure he paid his taxes. Plaintiff had not asked Lay for tax advice. Because of Plaintiff's prior financial-services experience, the directive caused him to think about whether taxes would be current or deferred and whether an asset was held through an IRA. Those were Plaintiff's internal questions, not questions Lay asked him. Lay laughed during the encounter. Together, the unsolicited directive and Lay's laughter sharply increased Plaintiff's anxiety and became the final event prompting him to tell Lay that he needed a different physician. His objection and physician-change request concerned those events and Lay's conduct, not Lay's or any other person's race.

**C. August 2 Racial Attribution**

41. Plaintiff had never before been confined at Spring Mountain. Before he sought a different physician, no one gave him a roster of available physicians or told him the race or

ethnicity of every alternative provider. Plaintiff did not know the identities and races or ethnicities of all other available physicians.

42. Plaintiff did not create, sign, submit, or see a change-of-doctor form containing the words “no blacks” or any equivalent racial restriction, and he did not communicate such a restriction orally.

43. On August 2, 2024, Lay completed and signed a two-page Physician Daily Progress Note at approximately 10:20 a.m.

44. Under “Chief Complaint (in patient's own words),” Lay recorded Plaintiff's words as “Oh no, not her.” The same note states that Plaintiff refused to answer questions and walked out. After requesting a different physician, Plaintiff understood or expected that he would not be meeting with Lay again. When he unexpectedly found Lay in the room, he said “Oh no, not her” and immediately left. Those contemporaneous words and conduct support Plaintiff's allegation that his objection was directed to Lay personally.

45. In the “Current Clinical Presentation/Update” section, Lay wrote that Plaintiff was requesting a change in doctor but wrote “no blacks” on a change-request form while “knowing fully well” that the other doctors were all of African descent. The same section described Plaintiff as “racially charged and discriminating.” The note does not identify any person who supposedly gave Plaintiff that demographic information or explain how a first-time patient acquired the knowledge Lay attributed to him.

46. The first page placed that assertion immediately above the form's mental-status examination, which the form labels “as justification for level of care.” The printed mental-status checkboxes on that page were not completed.

47. The second page marked “None” under other risk-assessment formulations, added Haldol as needed for agitation, identified “psychosis, hostile” as a barrier to discharge, identified “hostile, volatile” as the rationale for continued stay, and included a plan to continue the Legal 2000 custody status.

48. The progress-note records produced to Plaintiff do not include the alleged change-request form. Plaintiff does not allege from that absence alone that no form ever existed; he alleges from his personal knowledge that he did not create, sign, submit, or authorize a form containing the attributed words.

49. Lay knew that Plaintiff had directly objected to the lack of warning and preparation and that he requested a different physician after she told him, in substance, to make sure he paid his taxes during their cryptocurrency discussion and laughed during the encounter. Plaintiff gave Lay no race-based reason for the request and never told her that he knew the identities and races or ethnicities of all other available physicians.

50. On information and belief, Lay deliberately created the racial attribution or knowingly adopted and signed it as a factual account of Plaintiff's own written words and knowledge, despite knowing that account was false. If another person knowingly originated or knowingly supplied the false attribution, that person is pleaded as Doe 1.

51. Spring Mountain's later discharge summary repeated the substance of the race-based attribution in its summary of the August 2 encounter, transcribing the phrase as “no blanks” while repeating the supposed knowledge that the other doctors were African. That transcription variation is not independent corroboration of a source form. The available page identifies Lay as attending physician but does not identify the summary's author, dictator, signer, preparation date, or approval metadata.

**D. August 6 Proceeding and Crime-Admission Attribution**

52. On information and belief, a follow-up commitment proceeding was scheduled for August 6, 2024. Plaintiff was not transported or connected to it. He did not waive his presence, refuse to attend, or choose to miss the proceeding.

53. Plaintiff did not admit that he committed a crime and did not identify any crime. Any statement that he wished to invoke the Fifth Amendment did not mean that he admitted guilt and was not a waiver or refusal of the proceeding.

54. Lay's August 6, 2024 Physician Daily Progress Note instead states that Plaintiff reported he did not go to court because he wanted to plead the Fifth "because he admits he did commit a crime and does not want to discuss what the crime was."

55. That entry was false in two concrete respects. Plaintiff did not voluntarily decline the proceeding, and he did not admit that he committed a crime.

56. Lay wrote that she evaluated Plaintiff and signed the note. On information and belief, she deliberately mischaracterized any invocation or refusal to discuss allegations as a nonexistent admission and a false voluntary explanation for his absence from court.

57. Lay signed the August 6 note at approximately 11:00 a.m. The presently available records do not include the hearing recording or transcript, transport or connection log, counsel communication, or another source establishing the attributed admission.

58. The available discharge-summary page later repeated the assertion that Plaintiff wanted to plead the Fifth because he "admits he did commit a crime." The page does not identify who authored, dictated, signed, or approved that summary.

59. Spring Mountain discharged Plaintiff on August 7, 2024. Lay's signed discharge note states "released by court" and marks homicidal thought as "None."

**E. Use, Causation, Diligence, and Injury**

60. The August 2 racial attribution was not isolated from the custody assessment. Lay placed it in the clinical-presentation portion immediately above a mental-status section labeled "as justification for level of care," and the same signed note separately supplied a rationale for continued stay and a plan to continue Legal 2000.

61. Depending on the then-existing procedural posture, Nevada law allowed the facility to discharge Plaintiff before hearing if appropriate, NRS 433A.220(3), or, after an involuntary-admission order, allowed unconditional early release upon a qualifying professional's determination that he was no longer in a mental health crisis, NRS 433A.310(1)(b), (2), and 433A.390(3), (7). Plaintiff does not yet possess the hearing file and pleads those mechanisms in the alternative. Lay was identified as Plaintiff's attending physician and signed the August 2 continued-stay assessment. On information and belief, Lay was the physician primarily responsible within NRS 433A.390(3), or her assessment was supplied to and materially relied on by the facility official with release authority. The exact allocation of that authority is controlled by Defendants.

62. The August 6 crime-admission entry supplied an official but false post-hoc explanation for Plaintiff's absence from the scheduled proceeding and was repeated in the discharge summary. Plaintiff does not allege that the August 6 entry caused the earlier failure to connect or transport him or presently base his federal fabrication claim on that entry.

63. Although the chart recorded other asserted factors, on information and belief the false racial attribution was a necessary factor in Lay's August 2 decision to label Plaintiff "hostile, volatile," continue Legal 2000, and supply reasons supporting continued confinement. Absent that attribution, Lay would not have made the same August 2

continued-stay assessment, and Plaintiff would not have suffered the same period of confinement after 10:20 a.m. that day. The fabrication was therefore a factual and proximate cause of continued loss of liberty for a period to be established through records controlled by Defendants. The note's integrated structure—racial attribution in the clinical-presentation section immediately before “hostile, volatile” and continued Legal 2000—supports this inference. Plaintiff does not allege that the commitment court received or relied on the entry, and he does not seek damages for custody independently caused by other events or decisions.

64. Plaintiff's detailed records request was dated January 24, 2025. It sought, among other items, the physician-change form, source-document information, staff logs and related communications, records identifying personnel responsible for the proceedings, communications with the court, explanations for the missed follow-up proceeding, and assigned-counsel information. Spring Mountain states that it received the request on January 31, 2025, and its response letter is dated February 4, 2025.

65. The records presently available to Plaintiff do not include the alleged change form, the native audit trail, complete petition and attachments, hearing notices, video-access logs, transcript or recording, counsel-contact records, or the complete court file.

66. The response did not identify Doe 1, Doe 2, or Doe 3. Despite his records request and review of the produced materials, Plaintiff remains genuinely ignorant of their names. He has described each Doe by function and will seek prompt, narrowly tailored discovery and substitute the true names when learned.

67. Plaintiff suffered involuntary loss of liberty through August 7, 2024. During the confinement, on a date Plaintiff cannot presently identify, a security employee asked

Plaintiff, in substance and in another guard's presence, “Jeff, you hate Black people, right?” On a separate occasion, during an incident in which Plaintiff was physically restrained, a second facility employee who appeared to have a security or leadership role asked, in substance, whether he had tried to leave because the available providers were Black. Plaintiff tried to leave because he could not reach an advocate or attorney and could not obtain needed medication, not because of any provider's race. The comments echo the racial premise in Lay's note and show that the premise was circulating among facility personnel. Discovery is needed to identify the employees, the dates, and whether they received the premise from Lay's note, supplied it to Lay, or learned it from another source.

68. Plaintiff experienced severe humiliation, anger, anxiety, helplessness, confusion, and terror when facility personnel treated the false racial premise as something he believed. During the restraint incident he screamed for police and access to an attorney. Other patients witnessed his distress, and multiple patients later told him that staff should not have cornered him as they did while he was trying to cooperate. Plaintiff does not presently allege that the racial entry itself caused the decision to restrain him. He has also expended substantial continuing time and effort seeking source records, identifying the false entries, and attempting to correct the official account.

**COUNT I**

**42 U.S.C. § 1983: DELIBERATE FABRICATION OF EVIDENCE**

*Against Lay and Doe 1*

69. Plaintiff incorporates paragraphs 1 through 68.

70. The Fourteenth Amendment protects a person from a deprivation of liberty caused by evidence that a state actor deliberately fabricated. The protection applies when a liberty interest is at stake in a civil proceeding. Costanich v. Department of Social and Health Services, 627 F.3d 1101, 1108, 1111 (9th Cir. 2010).

71. Deliberate fabrication includes intentionally mischaracterizing a person's statements in an official report. A plaintiff must prove deliberate fabrication and factual and proximate causation of a liberty deprivation. Spencer v. Peters, 857 F.3d 789, 798-802 (9th Cir. 2017).

72. The August 2 entry attributed a specific written statement and specific knowledge to Plaintiff. Those are verifiable historical facts, not medical opinions.

73. Plaintiff's firsthand denial, his race-neutral reasons for seeking a new physician, his lack of the roster information and demographic knowledge Lay attributed to him, the missing alleged source form, Lay's own recording of Plaintiff's words as “Oh no, not her,” Lay's direct participation in the exchanges preceding the request, and Plaintiff's lack of any race-based statement support an inference of deliberate falsification.

74. If Lay personally created or reported the supposed form, she knew Plaintiff had not supplied the attributed words or roster knowledge. If Doe 1 supplied the attribution, Doe 1 knowingly invented it or knew it was false and supplied it for inclusion in Lay's continued-stay assessment; Lay is liable for adopting that attribution only if she knew it was false.

75. Lay and Doe 1 acted under color of state law because they knowingly created, supplied, or used the attribution as part of the intertwined, state-authorized involuntary-custody process.

76. On information and belief, the false racial attribution was a necessary factor in Lay's August 2 assessment that labeled Plaintiff hostile or volatile, supplied reasons supporting continued confinement, and continued the Legal 2000 status. Depending on the procedural posture, Nevada law allowed prehearing discharge when appropriate or early release after court-ordered admission following a qualifying professional determination. NRS 433A.220(3), 433A.310(1)(b), (2), and 433A.390(3), (7). On information and belief, Lay was the responsible physician or her assessment was materially relied on by the facility official with release authority. Absent the fabricated attribution, Lay would not have made the same August 2 continued-stay assessment, and Plaintiff would not have suffered the same period of confinement after 10:20 a.m. that day. Its use was therefore a factual and proximate cause of continued loss of liberty for a period to be established through discovery. Plaintiff does not allege that it was the only asserted basis for custody.

77. Plaintiff does not seek to vacate a commitment order or impose liability for testimony in court. He challenges the independent, non-testimonial creation and use of false records in a facility-side assessment that Nevada law made relevant to early release. Plaintiff seeks damages only for deprivations and distinct injuries legally caused by that fabrication, not for custody proven to have been wholly independent of it.

**COUNT II**

**42 U.S.C. § 1983: FIRST AMENDMENT RETALIATION**

*Against Lay*

78. Plaintiff incorporates paragraphs 1 through 68.

79. The First Amendment prohibits a state actor from taking adverse action in retaliation for protected criticism. A plaintiff must plausibly allege protected activity, action that would

chill a person of ordinary firmness, and that the protected activity was a substantial or motivating factor; the retaliatory motive must ultimately be a but-for cause of the adverse action. Capp v. County of San Diego, 940 F.3d 1046, 1053-59 (9th Cir. 2019); Sampson v. County of Los Angeles, 974 F.3d 1012, 1019-21 (9th Cir. 2020).

80. Plaintiff engaged in protected activity when he objected to the lack of meaningful warning and preparation for the remote proceeding and criticized Lay's conduct in connection with that proceeding. His request for a different physician conveyed that criticism.

81. Lay directly participated in the exchanges preceding the physician-change request. She knew that Plaintiff had criticized the lack of warning and preparation, and Plaintiff gave her no race-based reason for requesting a different physician.

82. Within approximately one to two days, Lay signed a note expressly linking that same physician-change request to a false racial restriction, described Plaintiff as “racially charged and discriminating,” and incorporated the attribution into the same assessment that labeled him hostile or volatile and continued Legal 2000.

83. The close timing, Plaintiff's firsthand denial, Lay's direct participation in the exchanges preceding the request, Plaintiff's lack of any race-based statement, the note's direct link to his physician-change request, and the absence of the alleged source form support a plausible inference of retaliatory animus. A chronology may support that inference when direct evidence of intent is unavailable before discovery. Capp, 940 F.3d at 1056.

84. On information and belief, Plaintiff's criticism was a substantial or motivating factor in Lay's creation or knowing adoption of the racial attribution, and Lay would not have created or knowingly adopted it absent the retaliatory motive.

85. Knowingly placing a false accusation of racial exclusion in a confined person's clinical and continued-stay record, and using it as part of the assessment governing his liberty, would chill a person of ordinary firmness from continuing to criticize the physician or the facility-controlled proceeding. Plaintiff's persistence in objecting does not defeat that objective standard.

86. Lay acted under color of state law because the retaliatory record was created, signed, and used as part of the intertwined, state-authorized involuntary-custody process. The conduct caused distinct humiliation and fear, and caused reputational and liberty injury to the extent established through proof.

87. Plaintiff does not allege that an ordinary good-faith clinical assessment was retaliation. This Count challenges Lay's intentional creation or knowing adoption of objectively false historical facts in response to protected criticism.

## COUNT III

## 42 U.S.C. § 1983: PROCEDURAL DUE PROCESS

*Against Does 2 and 3*

88. Plaintiff incorporates paragraphs 1 through 68.

89. Plaintiff had a protected liberty interest in avoiding continued involuntary confinement and a federal due-process right to meaningful notice and an opportunity to be heard.

90. Nevada's statutory protections are consistent with that federal interest. They require notice of the petition and hearing, advice and appointment of counsel, and the subject's presence at the hearing. NRS 433A.220, 433A.270, and 433A.290.

91. On information and belief, Doe 2 actually received or knew of the first remote proceeding and controlled one or more facility functions necessary to deliver available

papers, provide confidential access to counsel, move Plaintiff, or connect the video appearance.

92. On information and belief, despite that knowledge and control, Doe 2 deliberately connected or presented Plaintiff without first delivering available operative papers or providing a practical private opportunity to consult with appointed counsel.

93. On information and belief, Doe 3 actually received or knew of the August 6 proceeding and controlled Plaintiff's transport or video connection. Despite that knowledge and control, Doe 3 deliberately failed to transport or connect Plaintiff even though Plaintiff did not waive, refuse, or choose to miss the proceeding.

94. Those failures deprived Plaintiff of a meaningful opportunity to prepare, inform counsel, correct false information, speak, and contest continued custody while he remained dependent on the facility for all practical access.

95. The denial of process supports nominal damages. Plaintiff seeks compensatory damages only for emotional injury or additional loss of liberty proven to have been factually and proximately caused by each Doe's conduct.

96. Plaintiff does not allege that video participation is inherently unconstitutional, that a violation of Nevada procedure alone establishes § 1983 liability, or that Does 2 and 3 were responsible for acts of the court or counsel outside their actual knowledge and control. He alleges deliberate facility-controlled conduct, not negligence, and seeks relief only from each Doe shown to have personal causal responsibility.

**COUNT IV**

**DEFAMATION UNDER NEVADA LAW**

*Against Lay, Doe 1, and Spring Mountain*

97. Plaintiff incorporates paragraphs 1 through 68.

98. Lay made false written statements of fact concerning Plaintiff by attributing to him a written exclusion of Black physicians, knowledge that the other available physicians were all of African descent, a voluntary decision to miss court, and an admission that he committed a crime. Doe 1 is included only to the extent Doe 1 created or knowingly supplied the August 2 racial attribution.

99. On information and belief, the statements were published to third persons through Spring Mountain's shared internal treatment and custody records. The two facility comments described above are firsthand evidence that employees other than Lay were exposed to the racial premise, although the direction and timing of transmission remain unknown. The discharge summary's later repetition is also consistent with receipt or access by an additional preparer, reviewer, approver, or user, but the available page does not identify that person. Those identities and other readers are recorded, if at all, in access and audit logs controlled by Spring Mountain.

100. The statements tended to subject Plaintiff to contempt, hostility, distrust, or reduced credibility within the facility and commitment process. The August 6 statement imputed criminal conduct and was defamatory per se under Nevada law.

101. Lay acted with knowledge of falsity or reckless disregard for truth concerning the August 2 and August 6 statements. Doe 1 acted with that state of mind only concerning the August 2 racial attribution, if Doe 1 created or knowingly supplied it. Any qualified

common-interest privilege is therefore defeated to the extent Nevada law otherwise recognizes one.

102. The employees' comments show that the false racial premise circulated within the facility and caused Plaintiff humiliation, terror, and distress. Plaintiff seeks damages against each Defendant only to the extent that Defendant's publication is proven to have caused or contributed to those comments, reputational injury, or other recoverable harm.

103. This Count reaches internal circulation only to the extent the false chart statements were created or shared in ordinary clinical or administrative recordkeeping with facility treatment, records, or discharge-summary personnel. Plaintiff does not seek state-tort damages for testimony, court filings, or communications to a court, counsel, examiner, or other adjudicative participant that are entitled to an absolute judicial or quasi-judicial privilege.

104. Creating and circulating facility records was an assigned employment task, not an independent venture, and the internal circulation of such records was reasonably foreseeable. Spring Mountain is vicariously liable to the extent its employee or agent committed the tort within the course and scope of that assigned work.

**COUNT V**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*Against Lay, Doe 1, and Spring Mountain*

105. Plaintiff incorporates paragraphs 1 through 68.

106. This Count concerns intentional or reckless falsification and circulation of objectively verifiable historical facts: whether Plaintiff wrote a racial restriction and whether he

admitted committing a crime. A jury can decide whether those events occurred from ordinary evidence without resolving a medical standard of care.

107. This Count does not challenge diagnosis, medication, treatment, or professional medical judgment and does not allege professional negligence.

108. Knowingly branding a confined person as racially exclusionary or inventing an admission of crime, then using or circulating the falsehood in the process governing his liberty, constitutes extreme and outrageous conduct.

109. Lay intended to cause distress or acted with reckless disregard of the near certainty that severe distress would result from the August 2 and August 6 statements and their use in the locked facility and commitment process. Doe 1 acted with that intent or recklessness only concerning the August 2 racial attribution, if Doe 1 invented or knowingly supplied it.

110. Plaintiff suffered severe humiliation, anxiety, anger, helplessness, and fear that authorized readers would treat the false attributions as established facts. His screaming for police and an attorney during the restraint, witnessed by patients who later commented on his visible distress, provides objectively verifiable manifestations. The comments and restraint are context, not injuries caused by the entries unless discovery shows that connection. Plaintiff has devoted substantial continuing time and effort to identifying the entries' source and seeking correction of the official record.

111. The intentional conduct was a factual and proximate cause of Plaintiff's severe distress and related damages.

112. This Count does not seek damages based on diagnosis, treatment, professional medical judgment, testimony, court filings, or communications to a court, counsel, examiner, or

other adjudicative participant entitled to absolute privilege. It is limited to intentional or reckless falsification and ordinary clinical or administrative circulation of historical facts within the facility.

113. Creating and circulating facility records was an assigned employment task, not an independent venture, and the internal circulation of such records was reasonably foreseeable. Spring Mountain is vicariously liable to the extent its employee or agent committed the tort within the course and scope of that assigned work.

## PRAYER FOR RELIEF

Plaintiff requests:

1. Compensatory damages according to proof for loss of liberty, emotional distress, reputational injury, and other legally recoverable harm caused by each Defendant;
2. Nominal damages for each proven constitutional violation if compensatory damages are not established;
3. Punitive damages against Lay and any individual Doe Defendant whose conduct is proven to satisfy the governing federal or Nevada standard;
4. Prejudgment and post-judgment interest as allowed by law;
5. Costs and reasonable attorney's fees, if any, as permitted by 42 U.S.C. § 1988 and other applicable law; and
6. Such other relief as the Court deems just.

## JURY DEMAND

Plaintiff demands a jury trial on every issue triable by jury.

DATED: July 30, 2026.
Respectfully submitted,
Signature: /s/ Jeffrey M. Wiltse ______________

Jeffrey M. Wiltse, Plaintiff Pro Se | Las Vegas, Nevada
Telephone: (805) 570-9460 | Email: TheChosenMortal@ProtonMail.com